## Case No. 15,440.

### UNITED STATES v. INGERSOLL.

[Crabbe, 135.] [1]

District Court, E. D. Pennsylvania. April 5, 1837.

ALLOWANCE OF COSTS—TRIAL—FEES OF DISTRICT ATTORNEYS—EXTRA SERVICES—LOSS OF MONEY BY NEGLECT.

1. The allowance of costs to a district attorney is altogether in the jurisdiction of the judge, and not within the power of the officers of the treasury.

[Cited in U. S. v. Waters, 133 U. S. 212, 10 Sup. Ct. 249.]

2. Under the provisions of the act of 3d March, 1797 [1 Stat. 512], a district attorney's claim for a credit for costs, not taxed, but taxable, cannot be admitted on a trial, unless it has been presented to and disallowed by the accounting officers of the treasury.

3. Where a defendant has pleaded payment, and, at the trial, adopts such a course as to throw the whole affirmative proof on the plaintiff, the plaintiff has the right to reply.

4. The discharge of a debtor, before or after judgment, is not, of itself, a ground of charge upon a district attorney.

5. A district attorney is liable for money actually received by him, or which has been lost by his unwarranted neglect; but he is not answerable for the default, inattention, or frauds of the marshal.

6. Charges by a district attorney for what are called extra official services rendered by him to other subordinate officers of the government, on their application and request; which are not provided for by any act of congress; and were not performed on the call or requisition of either of the executive departments, and have not been sanctioned by them, or either of them; and which are not sustained by a usage so certain, uniform, and notorious as to be understood and known to both parties, so as, in effect, to be taken as part of the contracts; should not be allowed as a credit or charge against the United States.

1 [Reported by William H. Crabbe, Esq.]

7. Where the United States succeed to a claim of their debtor which is in suit against a third party, and the action is prosecuted to a termination in the supreme court of the United States, by a district attorney, by order of the government, he is entitled to a fee from the United States, for his services therein.

In the year 1815, the defendant [Charles J. Ingersoll] was appointed attorney of the United States, for the Eastern district of Pennsylvania. Many bonds, taken by collectors before that time, were transferred to him by his predecessor. These, together with bonds taken by collectors during his attorneyship, and given to him for suit, and various other official transactions, created an account between the defendant and the United States, consisting of a great number of items, and involving very large sums of money. Notwithstanding the efforts of the defendant, this account became more and more involved, and no effectual attempt seemed to be made by the proper officers to bring about the regular periodical settlements. Various letters from Mr. Ingersoll on the subject, ranging from the 26th July, 1815, to the date of the present suit, were produced at the trial, all urging the officers at Washington to a settlement. Among others, a letter dated 15th June, 1831, was addressed to the first comptroller of the treasury by the defendant, in which he stated that he then held the sum of $7,971.14 in trust for the United States, that he would make use of that deposit to procure justice, and apprised the comptroller that he would forthwith apply it to his own use and indemnity, requesting that no time might be lost in commencing suit against him on that ground.

This action, which was for money had and received, was commenced on the 25th May, 1836. The defendant pleaded payment and set-off, with leave to give special matter in evidence.

The account as stated by the plaintiffs charged the defendant with ..................... $2,785.939 04
And credited him with ......... 2,748.047 33

Leaving due to the plaintiffs.... 37.891 71
On which they charged interest 38,599 29

Making the whole amount claimed ....................... $76,491 00

The defendant acknowledged the following debts:

Amount received in Toler v. Armstrong ...................... $ 3,158 82
Amount received on bonds of Rodman and Waln. $5,487 86
Interest, &c. .......... 2,483 28
            7,971 14
Interest on that amount to date of suit ...................... 493 42
Amount received from Kinsman and Wright. $2.023 43
Less, fees and costs, &c. 344 36
            1,679 07

            $13,302 45

And claimed credits as follows:

Costs in revenue cases, taxed ................. $1,740 05
Costs in criminal (tea and forgery) cases taxed .................. 5,083 20
            $ 6,823 25
Fees in Conard's cases........... 1,000 00
Fee in Toler v. Armstrong....... 1,000 00
Fee in Amelia Island cases...... 1,000 00
Fees in militia cases............. 1,000 00
Fees for extra official services, from 1815 to 1829 ................. 11,675 00
Moiety of Edw. Thompson's forfeitures ... ................. 12,500 00

            $34,998 25
Leaving due to defendant a balance of $21,695 80.

The plaintiffs founded a portion of their claim on the fact that the defendant had marked certain suits as satisfied, without receiving the full amount due, and they claimed damages for this negligence of their attorney. In regard to the item of taxed costs claimed by the defendant, it was shown that Mr. Ingersoll had given to the marshal his receipts for the amount in order that that officer might have vouchers for his requisitions on the treasury; and that, the marshal being a defaulter, the treasury took the receipts in question and then passed the amounts to the marshal's credit, to balance his debts to the government.

During the trial, and in the course of the evidence, the following points arose:

On the 22d March, the defendant put in evidence a letter from the first comptroller of the treasury to the marshal of the Eastern district of Pennsylvania, dated 7th April, 1828, in which the payment of the clerk's and marshal's costs in certain suits was directed, while those of the district attorney were to be retained till further orders.

HOPKINSON, District Judge. The treasury officers have nothing to do with the allowance of costs. The law directs the judge to certify what is to be allowed.

On the same day, the defendant offered to give evidence of a set-off consisting of attorneys' fees, not taxed, but taxable.

Gilpin, U. S. Dist. Atty., objected, because the item had never been presented to and disallowed by the treasury. And the matter was passed over for that time.

On the 23d March, the defendant's counsel again offered the evidence.

C. J. Ingersoll, for defendant. This is not a case under the act of congress of 3d March, 1797 (1 Story's Laws, 464 [1 Stat. 512]). The defendant does not hold any money as a receiver of public money. He is an individual who happens to have money in his hands, and is sued for it. The act only refers to officers who have money to disburse. The first, second, and third sections refer to revenue and disbursing officers; and while the fourth section refers to individuals, it does not reach this case. These are taxable costs. They cannot be presented to the treasury, for

that department has nothing to do with them. The certificate of the judge is all that is required to allow them. U. S. v. Buford, 3 Pet. [28 U. S.] 29; U. S. v. Jones, 8 Pet. [33 U. S.] 383; U. S. v. Robeson, 9 Pet. [34 U. S.] 325.

Mr. Gilpin, for the United States. The defendant is a person accountable for public money. He receives as much as the collector. He is here charged as a public officer. His accounts have been adjusted at his own request. These three points bring the defendant within the first three sections of the law; and the fourth section applies to suits against any individual. The defendant has presented all his claims at the treasury but this one, and they have been regularly disallowed. The whole reason of the law applies to this case. It intended that the treasury should settle all just claims without controversy, unless it was impossible to procure vouchers, or accident prevented their procurement. This is not only the statute, but also the decision of the supreme court in U. S. v. Robeson, 9 Pet. [34 U. S.] 325. It was not here impossible to procure the vouchers, nor did accident prevent their procurement; and the defendant cannot avail himself of the exception, as he does not come within either of the reasons on which it is founded. The fact that the costs are ascertained by the court is no reason to take the case out of the act. The marshal's costs are ascertained in the same way; and if the rule now contended for is valid, his accounts could never be settled at the treasury. While congress made the taxing by the court conclusive evidence of the debt, yet that evidence must be regularly offered at the proper place. The cases cited from 3d and 9th Peters's Reports do not apply to us in this suit; and see U. S. v. Duval [Case No. 15,015].

J. R. Ingersoll, for defendant. The only case in which the credit claimed must be presented to the treasury is where the treasury transcript is made evidence. The transcripts are never evidence except where the account is of such a nature that it necessarily arises at the treasury. It is only to such cases that any of the provisions of the law apply. These costs never could have come within the knowledge of the officers of the treasury. Act May 8, 1792 (1 Story's Laws, 257 [1 Stat. 275]); Act Feb. 28, 1799 (1 Story's Laws, 569 [1 Stat. 624]). Above all, the act of 3d March, 1797, only refers to receivers of public money, which district attorneys are not.

THE COURT reserved the point for future consideration.

On the 25th March, Judge HOPKINSON said: "As to the point reserved on Thursday, I cannot admit the item. It has not been submitted to the treasury."

On the 23d March, the defendant's counsel asked the opinion of the court in regard to the right of reply.

J. R. Ingersoll, for defendant. Whether the United States or the defendant is to commence, I conclude. The plea of payment always gives the right to begin and reply. Latapee v. Pecholier [Case No. 8,101]; Norris v. Insurance Co. of North America, 3 Yeates, 84; U. S. v. Thompson [Case No. 16,487].

HOPKINSON, District Judge. If this case had gone on merely on the pleadings, it would have been a different matter. But here the defendant has forced the district attorney to prove his whole case at the outset as fully as if the plea had been non assumpsit. He objected to the treasury transcripts, and the district attorney went through the proof carefully and from various sources. The affirmative was thrown entirely on him; and the evidence of the defendant, except as to the set-off, has been confined to disproving the district attorney's allegations. The plaintiffs have the right to conclude.

The evidence having been closed on the 29th March, the district attorney commenced summing up.

Mr. Gilpin, for the United States.

The first thing required here is to accurately understand the plaintiff's claim. I do not pretend that all the items are of equal validity; some ought to be yielded. Our account was made from the best data, which are far from being perfect. The claim of the United States is for $37,891.71 principal, and $38,599.29 interest, being, altogether, $76,491.00. The items have been all exhibited, and the charges arise from the defendant's neglect, the suit being founded upon the principle that an attorney is liable to his client for loss suffered by his negligence. On the other hand the defendant, having charged himself with but $13,302.45, claims an offset of $34,998.25, for various items—principally for services rendered. This is the whole case, and on the evidence offered by either party, subject to the direction of the court on the legal points which may arise, the jury must decide the matter.

C. J. Ingersoll, for defendant.

The claims of the plaintiffs are all more than six, some more than twenty years old, which will account for the obscurity attending them. I agree to the law as laid down by the district attorney, but I must ask that, as there is no limitation against the United States, the jury will not condemn the defendant because of doubts or obscurity as to the circumstances of the items. The burthen of proof is on the plaintiffs; the plea of payment was put in to throw that burthen on the defendant, but, under the turn which the court have given to the proceedings, the plaintiffs are only entitled to what they prove to be actually due. The principle on which the plaintiffs' case rests is that the defendant's negligence has caused loss to the United

States. That is, they must have sustained loss by the defendant's neglect, and this negligence must be strong—what no man in his senses would do—for as the collector and other similar officers are not held liable for losses arising from honest errors—as in the case of the sureties taken by a collector becoming suddenly bankrupt—neither should a district attorney be held so liable. The sums admitted to be due by the defendant have been stated to the jury, and they must decide, from the evidence before them, whether the defendant is chargeable on the other items pressed by the district attorney.

Now examine the defendant's set-off. The first two items of $1,740.05 and $5,083.20, are for costs allowed by the law, but applied by the United States to pay another man's debts. The third item, of $1,000, is for fees in suits for the government under the act of 28th February, 1795 (1 Story's Laws, 389 [1 Stat. 424]), and is for a less amount than is charged by any other person. It is urged that the defendant was employed by the marshal, and not by the government; nevertheless, the United States are liable. Act Feb. 28, 1795; Act Feb. 2, 1813 (2 Story's Laws, 1291 [2 Stat. 797]); Report to Congress on Militia Fines in Pennsylvania, 25th April, 1822. The fourth item is for a fee in a case acknowledged by the government, but in which they only allow the defendant $850, and he now appeals to the jury to say whether that is a sufficient amount. The fifth item is for a fee in a case which the government prosecuted under a citizen's name. The sixth and seventh items are for services in suits prosecuted at Washington for the government; the assistance of the attorney-general was refused, the defendant was alone in difficult and voluminous suits, and it is in evidence that his successor has received $1,500 for subsequent and less services in the same matter. The eighth item is for fees for extra official services for fourteen years; it is about $800 a year. The defendant does not stand on common ground as to this charge. It is in evidence that he notified the comptroller on the 26th June, 1815. of his charges; that on the 18th July, 1815, they were authorized; that on the 12th June, 1816, the secretary of the treasury said there were various services which were not comprised in the general allowance, and which the comptroller was to revise and pass when certified by the auditor. The secretary ordered the comptroller to allow all that there was law for, and there is law for these, proved as they are. U. S. v. Wilkins, 6 Wheat. [19 U. S.] 135; U. S. v. Duval [Case No. 15,015]; U. S. v Fillebrown, 7 Pet. [32 U. S.] 28, 50; Lynch v. Com., 16 Serg. & R. 308; The Apollon, 9 Wheat. [22 U. S.] 376; Morris v. Hunt, 1 Chit. 544. It is scarcely necessary to cite cases to show that the United States had no right to pay the marshal's deficit with the defendant's money. Yet it will appear more fully by

Bartlett v. Pentland, 10 Barn. & C. 760; Hogg v. Snaith, 1 Taunt. 347; Howard v. Chapman, 4 Car. & P. 508; Scott v. Irving, 1 Barn. & Adol. 605; Vyse v. Clarke, 5 Car. & P. 403. As to the charge of interest, there is no right to make it unless the defendant improperly withheld money belonging to the plaintiffs, which he did not. Arnott v. Redfern, 3 Bing. 353; Du Belloix v. Waterpark, 1 Dowl. & R. 16; Uhland v. Uhland, 17 Serg. & R. 269; Harrington v. Hoggart, 1 Barn. & Adol. 577; Bainbridge v Wilcocks [Case No. 755]. If interest is chargeable against the defendant, it is also chargeable for him on an amount of $34,998.25. It is admitted that the defendant is chargeable with various sums (which Mr. Ingersoll stated at length), amounting in the whole to $13,302.45, as already stated.

J. R. Ingersoll, on the same side.

The defendant was district attorney at a very important period, and was in office for fourteen years. Numerous officers of the government, in various capacities, were relying on the defendant's advice to govern their conduct, and on that alone they acted. Eight years after he left the office, this suit was brought. During all that time no charge had been made that he retained public money, although he had given notice that he did so. He had presented his claims year after year; he had begged for suit, and it was not brought till the officers were fairly goaded into it. The defendant wished to be sued, because he knew that time deprived him of his chances of proof; death or fire might have taken from him every particle of his evidence. He went boldly before a committee of congress; and, when his affairs came to the notice of that body, they saw that the accounting officers had been guilty of great negligence, and so they reported. Thus urged, the plaintiffs set to work to make an account. They had no proofs of his indebtedness at the treasury, and they sent a fishing commission here to search for charges; they go back to the earliest times; to the collectorships of men who were dead before the defendant came to office. At first, they charged the defendant with upwards of $1,900,000. This was so absurd that they had to reduce it; and they now sue for a sum a little over thirty-five thousand dollars.

The plaintiffs' claim rests on four principles, as follows: (1) Claims growing out of alleged official misconduct and neglect on the part of the defendant. (2) A refusal to allow the regular costs due for the official business of the district attorney. (3) A refusal of just compensation for meritorious services rendered by the defendant at the request of government. (4) A refusal of indemnity for the unjust act of their officers in taking away bonds on which the defendant had a just lien for services rendered.

The claims under the first of these principles amount to some $32,000, and are in the

main obliterated by the evidence. The defendant has admitted that he is to account for about $13,000; this he meets by counter claims, similar to those allowed counsel in like cases, and which leave a balance in his favor of over $10,000. If we add to this the claim for a moiety of Thompson's forfeitures, amounting to $12,500, we have a balance in his favor of over $23,000. The earliest receipt of the money now retained by the defendant, was in 1826; before that time these claims had been regularly certified to and presented. The charges against the defendant are not for money proved to have been received—there is no proof of that—but they arise from the alleged negligence of the defendant, and from suits having been wrongfully settled, compromised, or marked satisfied by him. There is no wrong in entering satisfaction unless there is collusion to do so without any actual payment, or authority from the principal. An attorney has no means of proving the directions given him to enter satisfaction, or not to bring suit. It must first be shown that he had instructions and neglected them; we are not at liberty first to presume that he had no instructions for an act, and then make him liable for doing it. To make the defendant liable, there must have been neglect, and there must have been loss. We do not say that there must be exact evidence of these, but there must be some evidence of both.

Look for a moment at the character of the claims which are given to a district attorney for suit; they are almost uniformly desperate. No merchant comes to such a pass as to be unable to meet his bonds given to the United States, unless he is reduced to the greatest difficulty and necessity. All these suits are against insolvent men, and the very fact of insolvency gives to the United States all the debtor's property, to the preference of every other creditor whatever. If, then, a district attorney fails to recover the amounts due, the presumption is (if there is no evidence to contradict it), not that he has neglected to obtain the full amount, but that it was impossible to do so. There must be both gross neglect and loss. Smede's Ex'rs v. Elmendorf, 3 Johns. 185; Gilbert v. Williams, 8 Mass. 57; Dearborn v. Dearborn, 15 Mass. 316; Russel v. Palmer, 2 Wils. 325; Pitt v. Yalden, 4 Burrows, 2061; Huntington v. Rumnill, 3 Day, 390; Eccles v. Stephenson, 3 Bibb, 517; Alexander v. Macauley, 4 Term R. 611. The defendant was in office for nearly fifteen years, the number of suits brought by him were 4087, and, with all the exertions of government to make them more, the number of mistakes alleged against him are surprisingly small.

I now proceed to the defendant's claims.

Taxed costs in civil cases. These are settled by law. They are regularly taxed: and those due to the clerk and marshal, from the same cases, have been paid. They have been refused to the defendant because of the unsettled state of his accounts.

Taxed costs in criminal cases. This charge arises altogether from the neglect of the government officers, for there never was any objection to the claim. The defendant gave a receipt to an agent to enable him to receive the money. The treasury officers took the receipt but refused the payment, applying the amount as a credit to the account of the agent —the marshal. Now in law, this power to receive money did not authorize the agent to surrender the receipt for a mere credit; he had a right to ask for the money, and without it the receipt was not to be resigned. It was given up without payment, but the defendant cannot be made to suffer for this.

Extra official services. Where such services are rendered by a district attorney, he is entitled to a fair compensation. The distribution and compensation of duties do not depend on positive law, but on the discretion of the head of the department for which they are done. U. S. v. Macdaniel, 7 Pet. [32 U. S.] 14. And this usage governs past transactions. U. S. v. Ripley, Id. 18. Wherever services are necessary and unexpected, they are to be compensated according to usage. The compensation must be fair, and the service necessary, or sanctioned by the government. U. S. v. Duval [Case No. 15,015]. And funds in the hands of a party rendering such services may be retained to meet the compensation. U. S. v. Macdaniel, 7 Pet. [32 U. S.] 14. The services rendered by the defendant were meritorious and valuable. They were expressly stated to the comptroller of the treasury as early as the 1st July, 1822, on a request from him that the exact nature of the services should be explained, and were accompanied by certificates from the collectors, &c., to whom they were rendered. In 1816, the defendant wrote to the comptroller to know whether he should perform these services, and how he was to be paid for them. The comptroller told him he was to perform them and retain the compensation out of the moneys in his hands; but when, in 1822, the defendant sends his accounts he receives no answer till the 3d March, 1824, and then he is told they have been received, "and will meet with due consideration." This retaining an account for two years will make the party retaining it liable for its amount. After numerous applications by the defendant, the comptroller writes him, on the 31st August, 1830, "when your claims are acted upon, you shall be advised of the result." The defendant now appeals to the jury to make the settlement which has been evaded by the government. What are extra official services? Official services are defined by law. See Act Sept. 24, 1789, § 35 (1 Story's Laws, 67 [1 Stat. 93]). The attorney in each district is to prosecute crimes against the United States, and all civil actions in which the United States are concerned, except in suits in

the supreme court. and for his compensation is to receive fees taxed. He has, then, nothing to do with business out of court, as advice to government officers, &c. His duties, 1st, must be within the district; 2d, must be the prosecution of crimes against the United States, or, 3d, must be for civil suits in which the United States are concerned. The compensation given by law is that for the suits brought in court, together with the per diem. Suits are paid for out of their proceeds, attendance at· court out of the allowance therefor. The legal compensation is adapted to the services positively required by law, and to nothing more. For undefined employment there is an undefined ˙compensation; the only question is, who is to pay it? When a government officer calls on a professional man for advice for the benefit of government, the party benefited must pay for it. People v. Van Wyck, 4 Cow. 260. These services were matter of contract between the defendant and the government. It is in evidence that immediately defendant was appointed district attorney, he entered on extra services; that he announced this to the comptroller, stated what certificates of such services he would send, and what compensation he would ask; and that to this the comptroller agreed. But even if all this was not in evidence the implied contract which would arise from the performance of the services would suit the defendant equally well. The right to retain a just compensation for such services out of funds in the defendant's hands has been clearly recognised. U. S. v. Wilkins, 6 Wheat. [19 U. S.] 135. Now as the defendant had a right to retain this money, surely there is no right to charge him for doing so; no right to impose interest upon him when he kept the money with the plaintiff's consent, and was waiting to settle his account at any moment. The defendant's demand is also sanctioned by what appears to have taken place in every analogous case, according to the evidence given. As to the fee claimed in Toler v. Armstrong [Case No. 14,078], the facts as proved are fully sufficient to justify the demand. The United States succeeded Toler in his suit against Armstrong. They succeeded to the charges incident to the suit as well as to the benefits. One of these charges was for professional compensation, and this charge fairly attends the suit in the hands of the United States.

Now, let us look at the claim of $12.500 for a moiety of Thompson's forfeitures. What has been proved as to this charge? The collector in Delaware made certain seizures, and was entitled thereon to certain forfeitures. He employed˙ the defendant as his counsel, and agreed to allow him a certain proportion of those forfeitures, giving him a bond therefor. . The defendant .had also certain bonds in his possession. given by parties whose goods had been seized, and out of which he could have obtained the amount agreed to be paid him. These bonds the United States took out of his hands. ⏝ agree that they had a right to withdraw the bonds; but, doing so. they took them subject to the defendant's lien thereon, and this lien is now claimed as a set-off. Gallagher's Ex'rs v. Roberts [Case No. 5,194].

Mr. Gilpin, for the United States, in reply.

We will first see what the facts of the case are, and then examine the law applicable to them. The demand of the United States is for a principal amount of $37,891.71, and interest thereon amounting to $38,599.29. It arises from fifty-four sets of items, and is money charged to have been received by Mr. Ingersoll for the plaintiffs, and not paid over, or not collected when he should have collected it. The defendant has admitted the following sums to be due to the United States, subject to his set-off: that is,

| | |
|---|---|
| Money received on Rodman & Waln's bonds .................. | $ 7,971 14 |
| Accumulation thereon ............ | 493 42 |
| Money received in Toler v. Armstrong ........................ | 3,158 82 |
| Money received on Kinsman's account ˙ ....................... | 1.679 07 |
| | $13.302 45 |

If there are other sums due, they must be added to this amount. We contend that $4,-951.44, principal, and $2,475.66. interest, must be added to the amount chargeable on Rodman & Waln's bonds. The facts, as proved, and on which this claim is rested, are simply these. On the settlement of the bonds in question, the defendant gave them up on the payment of $4,951.44 less than the amount due on them, having, as he alleged, compromised the matter for the amount of $7,971.14, because the bonds were partly invalid, or, at least, of doubtful validity, although he had judgments thereon for the full amount due. He also produced a receipt from the collector for $7,971.14, in full of Rodman & Waln's bonds, but it is in evidence that the receipt was given under a promise by Mr. Ingersoll to correct any mistakes on his part; that the check he gave the collector for that amount was offered to be returned to him on the mistake being discovered; that he refused to receive it; that it was never presented for payment; that the defendant has stopped the payment thereof, and has invested the sum of $7,971.14 in trust for the United States. On these facts, and subject to the opinion of the court on the law, we think that on this item $4,951.44, principal, and $2,475.66, interest, should be added to the $13,302.45 admitted by the defendant.

(The district attorney then urged other items to be added. amounting to $1.310.75. principal, and $1,364.09, interest, and continued.)

The facts of these cases are that the defendant has entered satisfaction. released the liability of debtors to the United States, given up securities, or neglected to bring suits, with-

out authority, and made compromises against his instructions and duty. All this is a clear violation of law. It amounts to the fullest degree of negligence; and he is answerable for it.

1. It would amount to negligence sufficient to charge an attorney in a common suit; and so it should be, for the client submits everything to his attorney. Negligence is doing that which a skilful attorney ought to know he should not do, or leaving that undone which he ought to know he should do. The authorities are uniform, both in England and America, that an attorney is chargeable with a debt he is authorized to collect, if he acts in such a manner as to release the debtor. Russell v. Palmer, 2 Wils. 325; Pitt v. Yalden, 4 Burrows, 2061; Field v. Gibbs [Case No. 4,-766]; Gable v. Hain, 1 Pen. & W. 264–267; Floyd v. Day, 3 Mass. 403; Gilbert v. Williams, 8 Mass. 57; Dearborn v. Dearborn, 15 Mass. 316; Williams v. Reed [Case No. 17,733]; Huntington v. Rumnill, 3 Day, 390; Smede's Ex'rs v. Elmendorf, 3 Johns. 185; Kellogg v. Gilbert, 10 Johns. 220; White v. Skinner, 13 Johns. 307; Haynes v. Wright, 4 Hayw. [Tenn.] 65; Eccles v. Stephenson, 3 Bibb, 517; Crooker v. Hutchinson, 1 Vt. 73; Paley, Prin. Ag. 4, 220.

2. In case of a public agent the rule is much more imperative. Much is left to private attorneys, and the law will infer an authority because the principal may compromise. But no officer of the United States has any right to compromise a debt due to them. This is the settled law, and nothing can be shown to the contrary. The treasury never compromises; time is sometimes granted, but relinquishment never.

3. It is not necessary for the plaintiffs to establish any loss. (It is, however, apparent and actual here.) The defendant's plea of payment admits the receipt, and throws the negativing of loss on him. The United States have a right to rely on this plea as an acknowledgment of the receipt, and as proof of their demand; and, till the contrary be shown, the defendant has no right to call upon us to prove loss. In fact and in law, then, these sums are chargeable to defendant, in addition to what he has acknowledged to be due. The next amount which, we think, subject to the opinion of the court, is to be added to the defendant's indebtedness, is $3,687.79, principal, and $4,601.02, interest. This charge arises from various sums collected by the marshal in suits which that officer marked "Settled," thereby discharging the parties. The defendant was the principal law-officer of the United States; he should have examined all these cases, and have had the money paid into court. The duty of an attorney does not end with the judgment.

(The district attorney then adverted to an item of $5,149.40, principal, and $5,409.64, interest, for suits in which the parties were discharged, for insolvency, by order of the treasury; and one of $14,323.01, principal, and $13,456.10, interest, on suits said by the defendant to be erroneously referred to by the accounting officers. These items, however, he urged very slightly, admitting in both cases that, if the evidence was to be believed, the defendant was not chargeable.)

The total amount, then, which the plaintiffs have offered evidence to charge the defendant with, is $29,422.39, principal, and $27,-306.51, interest; and, adding to this principal the sum of $13,302.45, we have the full amount claimed, viz., $42,724.84, and interest.

As to the claim of interest, the defendant is certainly chargeable with it on those sums which are due because of his errors, neglect, &c., it will be damages for his default of duty. Thus then the United States is entitled to a verdict for, at least, $19,564.64, and interest, perhaps for $42,724.84, and interest, unless the defendant can show claims of his own to an equal amount. Has he done so? The first item he claims is $1,740.05 for taxed costs in revenue cases, not yet paid. If these costs have been proved to be taxed, which is for the jury to decide, they are a fair set-off. So of the second item of $5,083.20, for taxed costs in criminal cases. To the four claims of $1,000 each, arising from the militia cases, Amelia Island Cases, Toler v. Armstrong, and Conard's Cases, it is answered that no authority from any competent person has been shown, under which the defendant acted; and we shall see presently how impossible it is to admit that the United States shall be liable for professional services rendered at the request of subordinate officers. The next item claimed is for extra official services from March, 1815, to March, 1829, and amounting to $11,675. This claim is most important and unprecedented, and will require consideration at some length. It is not supported by the proper vouchers; but, if it were, it is altogether unlawful, and the defendant has no right to it. Contract, usage, and authority have been relied on as sustaining the charge, but neither of them exists. There never was any ground to suppose that a contract existed, unless indeed it is contended that a contract can arise from continual claim, which is, at least, a novelty.

There is no usage any more than there is a contract. No evidence of usage whatever has been given. There are now fifty district attorneys performing exactly the same services; since the claim was made there have probably been two hundred; all these claims, if usual, must have been presented at the treasury. Yet the defendant has not shown one instance of the kind. Indeed, the only evidence produced by the defendant to prove the usage in fact proves the opposite. There is no authority for such an allowance. It has not been contended that any direct authority exists, but that a similar principle has been recognised in four cases, viz., U. S. v. Wilkins, U. S. v. Macdaniel, U. S. v. Ripley, and U. S.

v. Duval [supra]. What is the point to be established? "That an attorney of the United States gives professional advice to a subordinate officer of the government, to aid him in performing his duty, without the instructions or assent of a head of department, is entitled to an annual sum to be charged on a general account, and paid by the government." Does U. S. v. Wilkins, 6 Wheat. [19 U. S.] 135, sustain this? Wilkins contracted with the secretary of war to furnish provisions, without fixing a price; he furnished them, and the secretary refused to pay as much as he asked. The court decided that Wilkins was entitled to a reasonable compensation, which a jury might fix. This does not approach the principle to be decided. Does U. S. v. Macdaniel, 7 Pet. [32 U. S.] 1, 14, meet the case? Macdaniel was a clerk in the navy department, and received his salary there. He was expressly appointed to perform two distinct and additional services for the secretary of the navy—to pay pensions, and discharge navy agent's duties. He was expressly and previously allowed a fixed and certain commission on moneys distributed for these services; he received it for twelve years regularly; in 1829 it was refused, and the court said that usage gave him a right until he received notice of change. There is nothing to support the defendant's claim. U. S. v. Ripley, Id. 18, instead of being authority for the allowance, expressly decides that, when the services are extra official, they must be performed to the government, with the sanction of a head of department, or in a peculiar emergency. In U. S. v. Duval [Case No. 15,015], it is laid down that a usage must be so settled as necessarily to make part of the contract, and allowances are confined to cases acted on by a head of department. Neither of these was the case here. These are all the cases, and they do not meet the present one either in principle, fact, or analogy. There is, therefore, neither contract, usage, nor authority to sanction the defendant's claim. Neither is it just in itself; it is a service rendered by one subordinate officer to another, according to their own agreement. What right have they to bind the government? To what combinations might it not lead? What right has an officer receiving a large salary to ask the government to pay his counsel fees? State officers, sheriffs, &c., make no such claim. The law meant to provide certain emoluments for district attorneys; these emoluments may be inadequate, but the legislature have thought otherwise. Perhaps the law should be different, but still it is the law.

Another item of the defendant's set-off is for $12,500, being a moiety of E. Thompson's forfeitures; bonds thereon having been given to the defendant by Mr. Thompson, and taken from him by the United States. The facts of this matter, as they are in evidence, should totally destroy the extraordinary claim which has been made. The collector in Delaware engaged Mr. Ingersoll as his private counsel, the government knowing nothing of the transaction. The defendant sued Thompson here, and, without authority, took bonds for large sums due to, the collector. When this matter became known to the government, the comptroller expressed his surprise, and demanded the bonds; they belonged to the United States, were for duties and penalties due in another district. The defendant at once relinquished the bonds. The United States directed their own officer to collect the bonds; the defendant permitted Thompson to pay over the money without interposing a word; allows the United States to receive it without ever knowing of this claim; and eleven years afterwards he requires them to pay him a fee which he says the collector had agreed to pay him for his private services, which fee the collector denies to be due, and is now being sued for. A case has been cited to sustain this claim: Gallagher's Ex'rs v. Roberts [Case No. 5,194]. But there the damages were ascertained; they were on a protested bill. Owing, however, to a rule of law (being damages), they could not be set off. Judge Washington said that they might be set off in equity. Is there any analogy? Here the whole claim is denied by the collector,—much more by the United States; and nobody knows whether it is good or bad.

Now, the utmost of all these claims which can be allowed are

| | |
|---|---:|
| Taxed costs in revenue cases | $1,740 05 |
| Taxed costs in criminal cases | 5,083 20 |
| Fee in Toler v. Armstrong | 1,000 00 |
| Fee in Conard's case | 1,000 00 |
| | $8,823 25 |

This sum deducted from $19,564.64, which, we have seen, is the least sum the defendant owes, leaves due to the United States $10,741.39, and interest; or even if deducted from the sum which the defendant himself admitted to be chargeable against him, leaves a balance of $4,479.20, and interest, due to the United States.

HOPKINSON, District Judge (charging jury). The claims of the plaintiffs were arranged or classed under four heads:—

| | |
|---|---:|
| 1. Custom-house bonds put in suit during the collectorship of Delany and Latimer, and remaining unpaid and unaccounted for to the treasury of the United States | $ 37,992 22 |
| 2. Bonds put in suit during the period in which Mr. Dallas was district attorney, and remaining unpaid and unaccounted for | 128,319 63 |
| 3. Bonds put in suit while the defendant. Mr. Ingersoll, was district attorney | 2,616,468 37 |
| 4. A debt recovered from Toler v. Armstrong, and received by the defendant | 3,158 82 |
| The total amount of these charges is | $2,785,939 04 |

The credits or deductions that have been allowed to the defendant at the treasury are as follows:

| | | |
|---|---:|---:|
| 1. The whole of the first of the above items of claim, which may, therefore, be expunged from the account...................... | | $37,992 22 |
| 2. On the second of the above items of claim, he is allowed, for bonds not received by him.................... | $ 82,536 15 | |
| On this item he is also credited with the amount of bonds collected by him and paid into the treasury, being.......................... | 43,481 93 | |
| | $126,018 08 | |
| Leaving a balance against him on this item of........................ | | $ 2,301 55 |
| 3. On the third of the above items of claim, that is, bonds received by him from the custom-house for collection while he was district attorney, he is credited as follows: | | |
|     I. Bonds on which he received no money...................$1,668,077 88 | | |
|     II. Payments which were made by him............................ 822,556 39 | | |
|     III. Payments made by his successors........................... 93,402 76 | | |
| Making his whole credit on this item.....................$2,584,037 03 | | |
| Leaving a balance against him on this item of...................... | | 32,431 34 |
| 4. To these is to be added the amount received by him from Toler v. Armstrong.................... | | 3,158 82 |
| | | $37,891 71 |

The balance, or principal sum, then, which is now claimed from the defendant, is thus made up:

| | |
|---|---:|
| Balance due on Mr. Dallas' bonds | $ 2,301 55 |
| Balance due on defendant's own bonds ........................ | 32,431 34 |
| Amount received in Toler v. Armstrong ........................ | 3,158 82 |
| | $37,891 71 |

The residue of the claim of the United States is made up of interest, calculated on each bond from the time it was put in suit to the 15th December, 1836, making the total amount claimed $76,491.00, with interest from the 15th December last.

You will understand that the ground of prima facie charge, or charge in the first instance, against the defendant is not that he has actually received the money or the bonds claimed from him, or that they have been lost by any misconduct or neglect on his part, but simply that if it appears, by the records of the suits, that the party against whom they were brought has in any manner been discharged of the debt, either before or after judgment, by a discontinuance of the suit, or by an entry that the demand has been "settled," it is then thrown upon the defendant, under whose direction the suits were placed, to show how they were settled, to show why the defendants were discharged from the claim, or to show that it was not by the payment of the debt to him, or in any other manner, to make him legally or equitably liable to the United States for it.

As a principle running through the whole case, I will here say to you that the discharge of a debtor, before or after judgment, is not of itself a ground of charge upon the defendant. He is liable for the money actually received by him, or which has been lost through his unwarrantable neglect; but he is not answerable for the defaults, inattention, or frauds of the marshal. He also is an officer of the United States; they take from him surety at their pleasure for the faithful performance of his duties; and the district attorney is not officially the surety of the marshal. The principle, however, is to be taken with the qualification that the loss arising from the marshal may not be traced to the official negligence of the district attorney.

(The judge then recapitulated the facts appertaining to each of the items of the plaintiffs' account, as they appeared from the evidence; and continued, as follows:)

We now come to the consideration of the most important and interesting part of the case; that is, the claim made by the defendant upon the United States by way of set-off. So far as they depend upon questions of law, they involve principles of vital importance; and I shall feel it to be my duty to speak of them in the most explicit manner, not only to prevent any misunderstanding on your part, but to give the party affected by my opinions an opportunity to have them reversed and corrected if I am mistaken.

The first is a claim or charge of seventeen hundred and forty dollars for fees taxed, allowed, and credited, but unpaid. No reason has been shown to me, either by any of the treasury documents, or by any evidence or argument offered at this trial, why this money should not be all paid to the defendant. They are legal fees to which he is entitled by act of congress. It is objected, and I remember no other objection, that they require the allowance of the judge. That is nothing but the evidence of the claim or right to be given to the treasury. But we are not confined to this evidence: at any rate, that allowance may now be given, either in the form it is now given by me, or by a certificate on the account.

Second, a claim of five thousand and eighty-three dollars and twenty cents, for fees taxed and allowed, but applied by the treasury to the payment of a debt due to the government by Marshal Conard. I can see no difficulty in this item of charge. The marshal was the officer who received from the treasury, not only his own fees but those of the district attorney and clerk. In the account he presented to be settled with the treasury, he charged these fees, which he was to pay over to them when received from the government, and was not bound to make advances to them. Conard goes to the treasury to settle his account; in it there was a charge against the government, of a certain sum which included the fees due to the clerk and district attorney. Two objections were made to the allowance of this credit claimed

by the marshal: 1st, that the fees of the clerk of the district and district attorney were not receipted; 2d, that it was undecided whether they should be paid by the treasury or the collector of the customs. In other words, the treasury required vouchers to support these claims made by the marshal. These vouchers were some account or receipt from those officers. In answer to this, all the officers put in Mr. Conard's hands the receipts in question, known to be for the mere purpose of enabling Mr. Conard to receive from the treasury the money due to them; and if, on these receipts, the treasury had paid the money to Conard, it is certain these officers would have been obliged to look to him for it. But the account with Conard was settled, and he would have been largely a debtor to the United States had they not allowed him a credit for these fees due to the clerk and district attorney; that is, had they not applied their money to pay his debt. If they supposed, which is hardly credible, that Conard had actually paid them this money, it was a mistake; but, at any rate, there was a misapplication of this money to Conard's account which ought to be corrected. Conard had authority to receive their money, but not to pass it in a credit to himself in his account. As the clerk had no other means of obtaining a return of this money, he applied to congress, who have honestly corrected the error.

We now come to a class of charges to which I request your serious attention; as, in my opinion, they depend upon principles of the highest importance. I shall not hesitate to give you my opinion upon them in clear and decided language, that you may understand my views of them, and the parties have the benefit of an exception to them if they shall think them erroneous. They shall be submitted to you under such instructions as I shall deem it my duty to give. They consist of charges or claims upon the United States for: (1) Counsel fees in the militia cases; (2) counsel fees in the Amelia Island cases; (3) attorney's fees for extra official services; consisting of advice, and, perhaps, other services rendered through the course of fourteen years, to various officers of the government, such as those of the custom-house, of the direct taxes, and of the naval and military establishments. These last claims amount to $11,675.

The first feature is, that these services form no part of the official duty of the district attorney. They are, indeed, claimed because they did not; and that they were performed by him simply as a professional man; and that the persons employing him had it at their option to go to any other lawyer in the same manner, for the same purposes, and in the same rights. The contract of Mr. Ingersoll, whatever it was, express or implied, for more or less, was a personal individual contract between him and the officers who employed him, and he was bound

to take care that they had authority to contract with him. This question then is presented for decision in this case: Whether the subordinate officers or agents of the government employed in the custom-houses, or the collectors of taxes, or in the army and navy, amounting to hundreds and thousands, all and every one of them, have in themselves and by virtue of their offices, without any act of congress, any authority from any department of the government, to make contracts with whom they please, binding on the United States? This is a most startling question, and if the law of the United States sustains this right, I will venture to say that no other law of any other government ever has done so, and that no government can live under it.

The ground of these charges is, that a custom-house officer, from time to time during the period mentioned; that the collector of taxes; that the marshal of the district; that certain naval and military officers—marines or recruiting sergeants—came to the defendant, not as the attorney of the government, not as the officer of the government, but as their attorney, selected by them; and engaged him in service on such terms as they chose, expressly or by implication, to make with him; and this contract is a contract made for the United States, which they are bound to perform and fulfil. Under such contracts, made by such officers, some $14,000 or $15,000, are charged upon the United States.

But let us turn from the circumstances of this case; from the services which I doubt not were meritorious; from the charges which may be just and reasonable; for these are utterly insignificant—a mere bauble, compared with the principle by which they are sustained. If these officers may make contracts with a lawyer binding on the United States, why not with anybody else, and for any other purpose they may imagine to be connected with the public service? We do not know that many of these cases of service and advice may not have been strictly personal, for which the officer was himself only liable. But I put this out of the question. No law of the land, no usage, no precedent, no authority of any sort or kind, has been shown to support such an authority to such officers. Are we now to make the law for the first time in nearly fifty years? What should be the regular course in such cases? The collector of the customs wants advice in a certain difficulty; let him, if there is time, consult the department; if there is not time, let him go to any counsel he pleases; let it be an affair between him and his counsel; let him make the contract for the service and pay it; and then, in his account with the government, he may charge it to contingent expenses. The officers of the treasury will examine it, and allow it, if it be such a service as they ought to pay for. He is a debtor of his lawyer, and the government is his debtor. But can he raise up a

creditor of the government without their knowledge or consent, unless he is authorized to do so by some act of congress, or by some official usage authorizing him to do so? In the cases where counsel fees are charged, as the militia cases, or a contract made by Marshal Smith (a defaulter and insolvent), there was no hurry, no emergency, requiring immediate action, so that the department could not be consulted. On the contrary, in all these cases the government had their counsel and paid their counsel, and the defendant was not the counsel they employed, but the counsel of the marshal, who had a large personal interest in the suits, and could afford to have his counsel; but in neither case was there any authority from the government to employ him.

As to the charge of $1,000, for services performed in the Amelia Island cases, in the district of Delaware, it stands upon a different footing from the militia cases. The services rendered by Mr. Ingersoll in Delaware, appear to have been performed by the direction, or at least with the approbation of the secretary of the treasury. In relation to these services the comptroller writes that he has had conversations with the secretary, and they had determined to allow eight hundred dollars for the several cases in the district of Delaware; but it appears that antecedent to this Mr. Ingersoll had settled with the collector of Delaware and paid him the moiety of the forfeiture belonging to the United States in the case of the Good Friends, and the collector had allowed Mr. Ingersoll one thousand dollars as his professional compensation from the United States. This the collector had no right to do. It was a transaction between him and Mr. Ingersoll, and was probably not known to the treasury when the comptroller wrote his letters, as no remark is made about it. The treasury, however, acquiesced in this addition of two hundred dollars to the sum they thought sufficient for the services rendered them, and supposed, it is presumed, the whole affair was settled. Mr. Ingersoll now alleges that the one thousand dollars received from the collector, was only for his services in the case of the Good Friends, and asks a further sum of one thousand dollars for Thompson's cases. He relies upon the receipt given by the collector to him to prove this. The receipt is not explicit. The one thousand dollars are said to be a compensation "for his professional services from the United States." It may refer to all his professional services, or it may be confined to the case then settled. But this receipt was a separate paper between Mr. Ingersoll and the collector. It has no binding power on the United States. It is to be recollected that in the comptroller's letter to Mr. Ingersoll, he is informed that the treasury had determined to allow him eight hundred dollars for all these cases. We have, as far as I recollect, no reply from Mr. Ingersoll to these letters,

from which we may infer that he acquiesced in this determination, with the addition of the two hundred dollars he had received; if there was this acquiescence, there is no foundation for the claim. He should have said at once, that so far from receiving eight hundred dollars as a full compensation for all the cases, he had already charged one thousand dollars for one of them, and expected another thousand for the rest. If you should not think that there was this silence and acquiescence, still if you think the one thousand dollars paid was adequate under all the circumstances (in which you may fairly take into your consideration his receipt in the same cases from the collector), you will not allow this item of $1,000.

In support of these claims, the letters of President Monroe, and Mr. Dallas, the secretary of the treasury, have been referred to. It is said the former has sanctioned the charge of counsel fees in the cases mentioned. Let us see if he has. I would premise that although the president has a right to employ any particular person on any particular service for the government, and to direct him to be paid for it; yet giving his opinion on a past case for past services, not performed under his direction and authority, but being in the nature of an opinion on a question of law, that opinion is of no authority here. I speak of authority. It will be respected, but it makes no law, nor does that of the secretary of the treasury. But what has the president said on this occasion? Mr. Ingersoll, for whom the president had a strong personal attachment, wrote to the president, stated his case, and urged his claim. What was the answer of the president? A most safe and prudent one. He sent Mr. Ingersoll's communication to the comptroller, who is the law officer of the treasury, and writes to know "if the district attorney of Pennsylvania has been called to render professional services to the United States, out of the state, and out of the line of the practice in that state?" I pay no regard to the verbal criticism of whether "and" means "or"—that is not the important part of this letter. But what follows? "And that if the call was made upon him by either of the executive departments, it forms a just claim to a reasonable compensation." This is exactly in conformity with the opinion of the supreme court, delivered several years after. But does it say, if the call was made upon him by a collector of customs in a different or the same state, or by a marshal, or a collector of taxes, at whose instance the service in question was rendered, that the counsel fees are allowable? No such thing, and the law officer, on this letter (if it were an authority) could not allow them.

In relation to these counsel fees, a usage has been attempted to be made out. That is Mr. Wirt's case. It is enough to say his services were performed by direction of the

president, at an arranged amount of compensation. As regards these fees, there is no act of congress; there is no order or authority from any of the executive departments; there is no usage; nay, there is no like instance from the beginning of the government to this day, nearly fifty years.

As to the item of advice, &c., to collectors, and naval and military officers, an attempt has been made to give it support by the sanction of Mr. Dallas, then secretary of the treasury, and, before that time, district attorney. The account was presented by defendant to the comptroller, and by him referred to Mr. Dallas, because of his knowledge and experience on the subject. What is Mr. Dallas's reply? "There are many services performed by the district attorney for which compensation is not provided by the acts of congress, nor by the state fee bill. The inequality and injustice of his compensation, compared with the compensation of attorneys of other districts, are correctly stated in Mr. Ingersoll's letter." This applies to the fee bill at New York, not to such charges as these. "If any law or precedent will authorize the settlement of Mr. Ingersoll's account, I think it ought to be allowed and paid." But as there was no law or precedent found for it, it was not allowed by the comptroller. As the letter from the comptroller to the defendant has also been relied upon to support these charges, it is proper to advert to it. It is dated on the 18th July, 1815, and in reply to one received by him from the defendant. After saying that he will refer the question of the fees to Mr. Dallas, he adds: "The manner in which you propose to keep and settle your accounts, and to receive the moneys which may be due to you for your official services, will be perfectly agreeable to me." In Mr. Ingersoll's letter, he had proposed to keep and render his account for these services, and says, "Instead of presenting separate accounts to each department, it would be more agreeable to me to state one entire account of the whole, and to present it to the comptroller for examination and settlement." To this manner of keeping and settling the account the comptroller has no objection. Mr. Ingersoll proceeds: "Should this mode of stating the account be approved, the mode of payment might in like manner be arranged so as to admit of the deduction of the whole sum due out of any fund paid into my hands." To this mode of paying what shall be due the comptroller also agrees; but as to the charges in question, he refers them to Mr. Dallas, and we have seen what he has said about them.

As to precedent or usage on this item: 1st. Mr. Dallas, the secretary of the treasury, who had been for many years district attorney, and in the stirring times of the embargo, &c., knew of none, or he would not have referred the question to the comptroller. Yet, doubtless, he rendered the same services, and probably in at least an equal number of cases. 2d. Mr. Dallas, the younger, says he rendered similar services, and never made any charge for them. 3d. Of all the district attorneys of the United States (probably not less than forty), no account or precedent has been produced of such claims allowed or made. Their accounts are placed in the treasury; some are, indeed, dead, but their accounts are there; and many are still living. The comptroller who settled the accounts of all the district attorneys knew of no claim like this. I do not inquire into the equity of these charges, nor how much of this service was performed by the defendant; we must have a lawful authority for them. The principle is this: if he had an application a day, and another district attorney but one a week, the right is the same.

I leave this part of the case, however, upon the argument on both sides; we must look to higher grounds to stand on. The question with us is not what were those services, or how reasonable are the charges, but, is the government answerable for them? Had the persons who made the contract for the services a right to bind the United States to pay for them? Are we now to make a new rule for this district, which is found in no other, and never has been in this or any other? Will the other districts follow us in the innovation? or are there to be as many rules for settling district attorneys' accounts as there are districts? Will the treasury officers of the United States settle such accounts in such various ways? It has been well put by the district attorney, whether two subordinate officers of the government can sit down together and make contracts with each other binding on the United States. Enormous would be the extent of the power; there are thousands of such officers all over the United States. The more or less of the service done is nothing; it is the principle, the power, which is the thing to be looked at. It has been argued by the defendant that, if there was no law for these charges at the time Mr. Dallas wrote his instructions to the comptroller, it has since been found by the supreme court, and cases have been referred to. These I shall briefly notice. The first is U. S. v. Macdaniel, 7 Pet. [32 U. S.] 14. Macdaniel was a salaried officer, a clerk in the navy department. The services for which he claimed compensation beyond his salary were no part of his duty for which the salary was paid; but they were required of him by the head of the department in which he was subordinate as a clerk, and he had no discretion to decline the labor imposed upon him. This is clearly within the principle of Mr. Monroe's letter. The service was required by the head of the department; it was no part of his duty under his salary, and formed a clear claim to compensation. The next is U. S. v. Ripley, Id. 18. Without recapitulating the details of the case, the extra claims were for planning

fortifications and disbursing moneys; but the principle laid down by the court was that equitable allowances should be made for extra services performed by an officer, which did not come within his official duty, and which he performed under the sanction of the government, or under circumstances of peculiar emergency; and this must be shown on his part. Now, we can understand how a military commander at a distance from the seat of government, or an Indian agent, as in Duval's case, may be called upon to disburse moneys or perform services indispensable to the public service, on the moment, and without the possibility of obtaining the sanction of the government; but whenever that sanction can be had, it must be obtained, else the officer acts at his peril. Now, whatever emergency there may have been in the case of any particular application to Mr. Ingersoll by a custom-house collector, or by a military or naval commander, yet at any time he might know, in a few days, whether the government would sanction such charges or no. Indeed, he made the application, and received no sanction. If the government was silent, Mr. Ingersoll should have suspended these services until he had their sanction. The next case is U. S. v. Fillebrown, Id. 28. There the defendant, Fillebrown, was secretary to the commissioners of the hospital fund, at a fixed salary. He claimed compensation for extra services in bringing up the records of the board, antecedent to his appointment, and also for disbursing moneys under the order of the board. It was, in the first place, held by the court that his having a salary did not exclude him from charging for these disbursements; that it was not necessary the board of commissioners should have passed a resolution for the payment of the commissions claimed by the defendant for making the disbursements, nor that the board should have sanctioned his claim for them. But it further appeared to the court that the secretary of the navy considered the agency of the defendant, in relation to this fund, as entirely distinct from his duty as secretary of the board, and that he was to have extra compensation for it,—that is, for that agency; and it also appeared that all this received the direct sanction of the commissioners. The secretary of the navy was the acting commissioner, and had authority for doing what he did. It was, therefore, says the court, "an express contract entered into between the board, or its agent, and the defendant, and that the board could not, after the service had been performed, rescind the contract, and withhold from the defendant the stipulated compensation." This was simply the case of the same individual holding two distinct appointments, with a stipulated compensation for each, and, of course, he was entitled to both. U. S. v. Duval [supra], decided in this court, was simply a recognition of the principles establish-

ed in the foregoing decisions of the supreme court.

The charges, then, which are made by the defendant, as a set-off against the United States on account of extra official services rendered to them or their officers, cannot be admitted, unless they are good and valid debts owing by the United States to the defendant; and they are not such debts,—unless the various persons by whom they were contracted might, at their discretion, and by their own authority, make contracts binding on the United States. This cannot be. It is my clear opinion that all the charges made in this case, by way of set-off against the United States, for what are called extra official services, rendered by the defendant to certain subordinate officers of the government, and on their application and request,—such as collectors and other officers of the customs, in this or any other district, collectors of taxes, the marshal of the district, and military or naval officers,—which are not provided for by any act of congress, and were not performed on the call or requisition of either of the executive departments, and have not been sanctioned by them, or either of them, and which have not been sanctioned by a usage so certain, uniform, and notorious, as to be understood and known to both parties, so as, in effect, to be taken as part of their contract, should not be allowed to the defendant as a credit or charge against the United States. I think that they should not have been allowed (as they were not) by the president, or the head of any department; and they are submitted to you, with these instructions as to the law. The seventh and eighth items of the defendant's set-off, as stated in the treasury transcript, are for "counsel fees in the suits of Nicholl v. Conard, and of Atlantic Ins. Co. v. Conard [Case No. 627]." The services were rendered; and our first inquiry is, whether he was employed in them by a competent authority. I think this is sufficiently shown. On the 27th November, 1828, Mr. Ingersoll wrote to the secretary of the treasury, giving him an account of the trial and termination of the suit of Nicholl v. Conard, and of the part he had taken in it. At the same time, he presented his charge of seven hundred and fifty dollars for his fees in that case, and a further charge of two hundred and fifty dollars for retaining fees in the insurance companies' suit, to which suits he says he appeared, according to the instructions of the secretary. On the 1st January following, the secretary writes to Mr. Ingersoll. He makes no objection to the charge in Nicholl's suit, on the ground that Mr. Ingersoll was not employed by the United States, nor on any other ground; nor does he deny that he had instructed Mr. Ingersoll to appear in the other suits. On the contrary, he says: "By direction of the president, I have to request you will take part, on behalf of the United States, in the argu-

ment of Atlantic Ins. Co. v. Conard [supra]." It appears to me that he acquiesces both in the authority for the services, and the amount of the charges for them.

There remain for my observation only the claims made by the defendant for his services in the suit of Toler v. Armstrong (vide 11 Wheat. [24 U. S.] 258), and for one-half of the moiety of certain forfeitures, of which he alleges he was deprived by the wrongful interference and acts of the treasury officers of the United States. As to Toler v. Armstrong [supra], I understand it to be, that a suit was brought in the circuit court of this district by Toler against Armstrong; Mr. Chauncey being the attorney and counsel of the plaintiff. Before it was terminated, the United States became entitled to the sum claimed by the plaintiff, by virtue of an assignment made to them. The original plaintiff, the client of Mr. Chauncey, having no longer any interest in the suit, turned it over to Mr. Ingersoll, as the attorney of the United States. Mr. Ingersoll took charge of it, conducted and argued it as the sole counsel of the United States, both here and in the supreme court at Washington, and finally succeeded in recovering and receiving the sum of $3,158.82. From this amount he deducts one thousand dollars as his professional fee, and is ready to pay over the balance to the United States. I confess that there is no item in any of the accounts of the parties to this suit which has embarrassed me so much as this. I have turned it again and again in my mind, to reconcile what appeared to me to be the equity of the claim with the higher obligations of the declared law of the land.

It has been made a question in the argument of the defendant, whether, in performing this service, he should be considered as acting for the United States, or for Toler, the party and plaintiff on record to the suit. I cannot consider him as acting as the attorney of Toler; he had no authority from, or intercourse with him, nor did Mr. Chauncey surrender the action to him in that character, but clearly as the attorney of the United States. Toler had no longer any interest or lot in the suit or claim, and it was because he had not that his counsel abandoned it, and it was put into the hands of the attorney of the party who had succeeded to Toler's rights, and for whose benefit the suit was therefore prosecuted. I must consider Mr. Ingersoll as acting as the attorney of the United States in the prosecution of that action. How does his claim for compensation stand in this view of the service? The act of congress of the 24th September, 1789 (1 Story's Laws, p. 67, § 35 [1 Stat. 93]), enacts that "there shall be appointed in each district, a meet person, learned in the law, to act as attorney for the United States in such district, who shall be sworn or affirmed to the faithful execution of his office, whose duty it shall be to prosecute in such district, all delinquents for crimes and offences cognizable

under the authority of the United States, and all civil actions in which the United States shall be concerned, except before the supreme court (which then was held in this city), in the district in which that court shall be holden," and "he shall receive, as a compensation for his services, such fees as shall be taxed therefor, in the respective courts before which the suits or prosecution shall be." Now, it is very clear, and has always been so understood, that for all the duties and services imposed upon and performed by a district attorney under the directions of this act, his fees, taxed as aforesaid, are the only compensation he can claim from the United States. Our question, then, is reduced to the inquiry whether the services performed by the defendant in the case of Toler v. Armstrong are such as are described and intended by the act of congress? The words are: "All civil actions in which the United States shall be concerned." They are sufficiently comprehensive in their literal sense to include this case; but yet I have very serious doubts if they were ever intended to be so applied. They, indeed, had an interest in the money to be recovered in this action, and they were so far concerned in it; but they were not concerned as a party to the subject of controversy, directly or indirectly. If the money should be recovered, it would be theirs; if the plaintiff should fail, the judgment for the defendant would have no operation upon the United States in any way, or for any purpose. Their interest—their concern in this action—was accidental, collateral, contingent. The court in which the suit was prosecuted knew nothing of the United States as a party concerned in it. These considerations, and others of a similar character, have raised an unquieted doubt in my mind whether the defendant should be excluded from a reasonable compensation for this service; but I think his claim may be put upon a more certain ground. I would not say that this was an extra official service, but rather an official service, or service performed for the United States directly (not by implication, in the person of a subordinate officer), for which no compensation is provided by law, and for which the executive or a head of department might and should allow compensation. It will be remembered that the act I have referred to expressly excepts from the duties of the district attorney (for which the compensation is provided by that act), civil actions before the supreme court; and this was the case when the supreme court sat in this city, at the door of the district attorney. It was no part of his duty, even then, to argue the cause of the United States in that court. If we then should lay out of this case all that was done by the defendant in the circuit court of this district, we find him following the case to Washington, and there arguing it alone (as appears by the report), against Mr. Webster and Mr. Wheaton; he succeeded, and the treasury of the United States is so much enriched by his la-

bors. But was this a mere volunteer service, for which he can raise no claim for compensation? By no means. The United States accepted the service; they relied upon it alone, they had no other counsel, and this is enough to raise a contract for compensation for the service. It is entirely different from the cases in which the defendant entered into the service on the application, and as the counsel of other persons, although they were officers of the government. In these cases the United States neither originally required, nor ever accepted the service, as rendered for them, or by the requisition or sanction of any of the heads of department.

The last item of set-off, or charge against the United States which it is necessary to call your attention to, is that stated as the tenth item in the treasury transcript. It is a claim for twelve thousand five hundred dollars for a moiety of the fines and forfeitures received from E. Thompson and others, for which a bond had been given to the collector of Delaware, which bond was in the hands of the defendant, and was taken out of his hands by the comptroller of the treasury. The defendant alleges that he was thereby prevented from getting into his hands the money due on it, and from retaining out of it the one-half the moiety belonging to the collector, according to an agreement between him and that officer.

The transactions upon which this claim is founded are very clear and intelligible. Certain vessels had been seized in the district of Delaware, by the collector, for a violation of the laws of the United States, and prosecutions for the fines and forfeitures incurred, were instituted against them in that district; of course the district attorney of this district had, officially, nothing to do with these proceedings. But the collector of Delaware, having himself a large interest in these forfeitures, thought it expedient to come to Philadelphia and engage Mr. Ingersoll as his counsel, as he might have done any other gentleman of the law here or elsewhere. He made an agreement with Mr. Ingersoll, which was purely personal on both sides, by which he bound himself to divide with Mr. Ingersoll the moiety of these forfeitures, which would belong to him in the event of a recovery in the prosecutions. After this agreement was made, Mr. Ingersoll negotiated a compromise of the suits with the owners of the vessels and cargoes; one of which belonged to S. Girard, and two others to E. Thompson and others. From Mr. Girard Mr. Ingersoll received the sum of $53,245.10, one-half part of which belonged to the United States, and the other half to the collector and his counsel, with whom he had agreed to share it. A compromise was also effected with the owners of the other vessels and cargoes; but, they being unable to pay down the money as Mr. Girard had done, Mr. Ingersoll took their bond for the amount. With this the treasury officers were highly dissat-

isfied, and denied the authority of Mr. Ingersoll to do it. This bond, given by Mr. Thompson, was left by the collector in the hands of Mr. Ingersoll; some time after, but before the bond was paid, Mr. Ingersoll received a letter from the comptroller, in reply to a letter from Mr. Ingersoll which we have not; in this the comptroller says he has had a conversation with the secretary of the treasury, and continues: "We are of opinion that the bonds ought to be transmitted to the treasury. You will, therefore, send them to this department." Mr. Ingersoll immediately transmitted the bonds to the comptroller, making no objection of any kind, claiming no right in them, nor giving any intimation of his interest in them under his agreement with the collector, or in any other way. The bonds were afterwards, by the collector, put into the hands of Mr. Duane, and the whole amount recovered and paid to the collector. The amount recovered was finally divided between the United States and the collector; the United States having received not a dollar more than their own money; and the collector having in his hands his own part as well as that which is claimed by Mr. Ingersoll. The ground of this charge then against the United States is, not that they have received and held the money belonging to the defendant, but it rested on the allegation that an officer of the United States wrongfully dispossessed the defendant of the bonds; that, if he had not done so, the defendant would have recovered the money, and not Mr. Duane, and thus have been enabled to retain from the collector the share due to himself. Supposing that the United States would be answerable to him, in this suit, for a tortious act, a wrong done by one of their accounting officers; where was the wrong here? The bond was given to a collector of the United States; as such he was a trustee for the United States, at least for one-half of the amount secured by it. The direction to send it to the treasury was, as I understand, with the approbation of the collector, the other party interested in it; at least, we have heard of no objection on his part. Where then was the wrong on the part of the treasury officer? He knew nothing of Mr. Ingersoll's claim or interest; he had no notice of his right; no violence was used to obtain possession of these bonds, no menace, hardly an order. The comptroller states the opinion of the secretary and himself, and thereupon says to Mr. Ingersoll: "You will, therefore, send them to this department." It was done; and it was not until many years afterwards, that the treasury knew of Mr. Ingersoll's claim, or the agreement by which he supports it. The money claimed by Mr. Ingersoll is in the hands of the collector, whom he has sued for it; and in that suit, the questions, whatever they may be, between him and the collector, will be examined and settled by a court and jury; and should we charge the United States with it, and the col-

lector should afterwards show that nothing is due to Mr. Ingersoll, how could we remedy the injustice? If Mr. Ingersoll thought the bond was improperly and wrongfully called out of his hands, he should and might have resisted the call, and stated his reasons. The bond did not come into his hands as the attorney of the United States, as a public officer; and he was not bound to obey the call for it as a public officer, but had the same right over it as over any other paper placed in his hands by a client. I cannot see the shadow of a claim, in law or equity, upon the United States to answer this demand.

Every controversy brought before a judicial tribunal for decision must consist of matters of fact, and matters of law; and the legal justice of the case depends upon the facts as they appear by the evidence, and the due application of the law to those facts. Our system of trial is admirably contrived to obtain a decision consistent with the law and the facts. The latter are referred to a jury, whose natural intelligence and knowledge of men, and the business of men, make them excellent judges of the credibility and effect of evidence. On the other hand, the judge, from his legal education and studies, is better qualified to declare and apply the law to the case. The whole value of this mode of trial depends on the separate but harmonious action of these two powers; the power of the jury over the facts; of the court over the law. The law is a permanent system for all cases, and should be intrusted to an authority which is constant and permanent; the same to-morrow as to-day; for one man as for another. The judge in pronouncing it, acts under a personal as well as official responsibility. It must stand on an authority which is not versatile and uncertain, or there will be no security for any of the rights of persons or property for anybody. The opinion of one jury is no rule for another; the verdict of one has no binding power on another; it would be ruin to us all to confide in such a tribunal for the law. A great part of this case belongs to you, and be assured that I shall not disturb your possession of it. On the other hand, I deem it to be equally my right and duty to take possession of the part that belongs to the court, and to maintain the authority of the law, according to the best of my judgment, so far as it is intrusted to me.

There is another most valuable trait in our mode of trial. I mean its publicity; whether the final decision, as it respects money and property, may or may not be satisfactory to the parties, they are sure of this important effect from the trial, that the true character of the controversy will be fully explained and understood. If unjust, or illiberal imputations have gone abroad; if the motives, the conduct, the integrity, and fidelity of either of the parties have been misrepresented by injurious rumors, they will be dissipated, and the truth be made known by a public and thorough examination of the whole circumstances of the case before an impartial tribunal.

On the 6th April, 1837, the jury rendered a verdict for the plaintiffs for $3,985.78 and costs. The items appearing, from a paper handed by them to the district attorney, to be as follows:

**Dr.**

| | | |
|---|---|---|
| Mr. Ingersoll, with amount received from Rodman; but, as payment was immediately tendered, without interest | $ 7,971 | 14 |
| Amount received in Toler v. Armstrong | 3,158 | 82 |
| Amount received from Kinsman.. | 1,679 | 07 |
| | $12,809 | 03 |

**Cr.**

| | | |
|---|---|---|
| Mr. Ingersoll with costs in revenue cases taxed | $1,740 | 05 |
| Costs in criminal cases, taxed | 5,083 | 20 |
| Counsel fees in Nicholl v. Conard, and Insurance Cos. v. Conard | 1,000 | 00 |
| Counsel fees in Toler v. Armstrong | 1,000 | 00 |
| | 8,823 | 25 |
| | $3,985 | 78 |